### R. T. BARLOW v. THE STATE.

#### No. 5159.  Decided October 30, 1918.

**Seduction—Sufficiency of the Evidence.**

Where, upon trial of seduction, the evidence was sufficient to sustain the conviction, under a proper charge of the court, there was no reversible error.

Appeal from the District Court of Van Zandt.  Tried below before the Hon. Joel R. Bond.

Appeal from a conviction of seduction; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*E. B. Hendricks,* Assistant Attorney General, for the State.

PRENDERGAST, JUDGE.—Appellant was convicted for seducing Miss Geneva Lester and was assessed the lowest punishment.

There is no bill of exceptions.  The only question for decision is appellant's motion for a new trial wherein he claims "the testimony is too doubtful and unsatisfactory for the judgment of conviction to stand."

The statute is:  "If any person by promise to marry shall seduce an unmarried female under the age of twenty-five years and shall have carnal knowledge of such female he shall be punished," etc.  (Art. 1447, P. C.)

The offense is alleged to have been committed on or about June 20, 1913.  Appellant was indicted October 17, 1913.  He was not tried until in May, 1918, for the reason that as soon as he learned, early in September, 1913, that he had gotten the seduced girl pregnant and she and her mother were urging him to marry the girl right away in accordance with his promise of marriage, that he fled from this State, going to California, and that while the officers hunted for him and tried to locate him all over the State they did not succeed in arresting him until about January 1, 1918.

The seduced girl, Geneva Lester, testified that appellant began waiting upon her—kept company with her—in the spring of 1911 when she was sixteen years of age, or just about seventeen years of age.  That

he waited on her at that time some three or four months and she quit going with him then because of his misconduct. He wanted to put his arms around her and kiss her. That he tried to put his arms around her and kiss her a number of times. That she told him not to, and that is the reason she then quit going with him. After an interval of some weeks or months he began going with her again, and after they had gone together again some three or four months she again quit going with him because of his misconduct. "He commenced sort of like he did before, tried to put his arms around me and then tried to go further." That all these times he was going with her he made love to her. That in October or November, 1912, she began going with him again and he made love to her and they became engaged early in 1913. He continued to go with her until about September, 1913. He was then about twenty years old and she about two years younger. She said she had sexual intercourse with him about two weeks after they became engaged to be married, and she permitted him to have sexual intercourse with her because "I loved him and he promised to marry me." That at the time she had intercourse with him "he began about how much he loved me and all those kind of things, then he said—he finally kept on at me trying to—well he told me I said I loved him well enough to do anything for him, and he told me then what he wanted me to do, and I told him I loved him well enough to do anything in reason, and he said that was in reason, and I told him it was not. But finally, after he kept on and said there would be no danger and wasn't any harm in it and we were engaged and it would not make any difference, we was same as one anyhow, I submitted to him." She was asked on cross-examination: "Did he tell you in that conversation that if anything happened, there was no danger, but if anything happened he would marry you?" "No, sir: he told me he loved me and we were going to marry anyway."

Appellant himself testified and admitted that he began waiting upon said girl and she quit going with him at the intervals she stated, substantially as she testified, and that the first time he had sexual intercourse with her was in 1913, saying: "And the time she told on the witness stand that we had intercourse is correct and she told the truth there." Among other things, he swore: "I wouldn't say that I never made love to her because things like that lead up to the other." That he wouldn't say that he did not tell her he loved her, but said: "Yes, I did kiss her, that was where it started. I might have told her I loved her; I might have told her that a good many times, I am not sure. She told me she loved me and I think I told her that I loved her." That as to him begging and persuading her to have intercourse with him, he said there wasn't very much begging or persuading to it. "I just kept on until we had intercourse. As to whether I just gained her love and wormed myself into her affection until I finally accomplished my purpose and ruined her, I don't know whether I gained her affection or not." He claimed that on the different periods of time he

was going with her that he commenced to put his arms around her and to be familiar with her, that she did not rebuke him but that he did not remember why he quit going with her the first time. That on the second period of time when he began to go with her that he put his arms around her and kissed her and felt of her some, and after that he quit again. That he quit her on that occasion because they had a fuss. That he did not want her to be going with Dee Neil, and she would not do it. And that is the reason he quit her at that time. That while he was going with her in 1913, when he had intercourse with her, he said: "I don't know as I did love her—sometimes I thought I did and other times I didn't."

Said seduced girl further testified in substance that appellant got her pregnant about the middle of June, 1913. That she had a child by him born March 17, 1914. She further testified that soon after she discovered he had gotten her pregnant she told him about it and wanted him to marry her and also then told her mother. That about September 1st he came to her home and her mother asked him about it and he owned up to it, "and she asked him if he had promised to marry me and he said he had, and he says, 'I am to blame for the whole business,' and she says, 'What are you going to do about it?' and he says, 'I don't know, I am willing to do anything that is right,' and she says, 'You know the only right thing is to go ahead and marry'; and he said, 'Well he didn't know what he could do,' and they talked on a while." She didn't know just what all they did say. "But he said, he told her that he would consider things and come back another time, and so she told him all right." That they then fixed the time he should come back, which was some few nights later, and that he came back at the time they agreed upon. That she met him and they went into the front room; that her mother came in and asked him what he had decided to do, and he said he didn't know   And he proposed to take her to a sanitarium and her mother said, no, he would not do that, that he had promised to marry her and that it was nothing but right that he should do it, and so he hemmed and hawed there a while and said he would. She finally set a day and he said he could not then as it was too soon. And she said, "I will leave it with you all to set the day." She went out, and while her mother was out she and he set the day for the next Sunday week after that. He said he would see her the last of the week; that he would see her somewhere before that. "And from that time I have never seen him only the first time at court (in 1918). That is the only time I have seen him since that day." That he did not come to her home after the night they had set the time for the marriage.

Mrs. Lester, the mother of said girl, testified, corroborating her daughter. She further testified, as her daughter had, that about September 1, 1913, appellant was at her home and she and her daughter talked the matter over with him. She asked him if he had promised to marry her daughter, and he said he had, and she told him what her

daughter had told her, and he said it was all so, that he was to blame for the whole thing. She asked him what he was going to do about it. He said he·didn't know whether he could marry her or not. She kept insisting on him telling her what he would do about it and he then put her off agreeing to come back at another time some days later and see about it. He came back as agreed and then he proposed he would take her daughter to a sanitarium and get her shed of it and pay all expenses, and "I told him I would not agree to that at all"; and that she kept insisting and told him the only right thing to do would be to marry her, that he had promised to marry her. That he at first would not agree to marry her. Finally he said, "Yes, I will marry her." She insisted upon them marrying the next two or three days. He thought that would be too early and he could not get ready at that time and then he and her daughter fixed the time at Sunday week following. He. then left her home and she had seen him no more until this term of the court. She said at the time he was at her home and she and her daughter talked it over with him, she told him that her daughter had told her he had promised to marry her and that he said that that was all so; that all she told him that her daughter had told her was so and that he said he was to blame for the whole thing.

Appellant himself testified and the effect of his whole testimony was to corroborate said girl and her mother in practically all they had testified except that he denied that he was engaged to be married to the girl when he first had sexual intercourse with her, and denied he agreed to marry her when they insisted he should in accordance with his promise in September, 1913.

The State proved by Mr. Kellis, who was the sheriff of Van Zandt County in 1913, when the indictment herein was found, and who continued as such officer until December 1, 1916, that from the time said indictment was found he diligently sought appellant all over the State but could not locate him. Mr. Carpenter, his successor in office, swore that after he came in he tried to locate him so as to arrest him and did not do so until about January 1, 1918, at which time he located him and he was arrested and brought back.

Appellant swore that in the last interview he had with the girl and her mother as testified to by them, that her mother told him, "You will have to marry that girl or I will tell the boys and there will be trouble." That was the reason he fled. The girl and her mother denied that any such threat was made by them or either of them at any time.

All the testimony in detail has not been given but the substance of it on the material points has been.

The court gave a full, complete and apt charge and required that the jury must believe all the necessary requisites to show that appellant seduced said girl beyond a reasonable doubt before they could convict him. · No complaint is made of the charge in any respect. In 2 Branch's Ann. P. C., section 2705, it is said: "When the jury have

solved the questions presented in the testimony under a fair and proper charge of the court and have found a defendant guilty of seduction and that verdict has been approved by the trial judge, whose duty it is to set it aside if not satisfied therewith, and there is sufficient evidence in the record, if believed, to sustain the verdict, it will not be disturbed on the facts on appeal unless clearly wrong." He cites a large number of cases so holding. All these requisites were met in this case and we are not at liberty to set aside the verdict and judgment of the lower court under the law and evidence.

The judgment is affirmed. *Affirmed.*